**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0390-24

BREIA RENNER,

     Plaintiff-Appellant,

v.

COUNTY OF GLOUCESTER,
GLOUCESTER COUNTY
PROSECUTOR'S OFFICE,
CHRISTINE HOFFMAN,
and THOMAS R. GILBERT,

     Defendants-Respondents.

_____

Submitted January 6, 2026 – Decided July 21, 2026

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-0119-24.

The Vigilante Law Firm, PC, attorneys for appellant (Jacqueline M. Vigilante and Christopher J. Ross, on the briefs).

Brown & Connery, LLP, attorneys for respondents (William M. Tambussi and Therese M. Taraschi, on the brief).

PER CURIAM

Plaintiff Breia Renner, a Gloucester County Prosecutor's Office (GCPO) detective, appeals from the August 30, 2024 Law Division order denying her motion for leave to file an amended discrimination complaint against her employers, defendants County of Gloucester, the Gloucester County Prosecutor (GCP), the GCPO, and the GCPO Chief of Detectives. Previously, on April 12, 2024, the trial judge granted defendants' motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Rule 4:6-2(e) without prejudice. Because plaintiff's complaint should have survived defendants' dismissal motion, we reverse.

I.

A. Background.

On January 30, 2024, plaintiff filed a six-count complaint against defendants asserting claims of sexual orientation- and gender-based hostile work environment, and sexual orientation-based discrimination, retaliation, and discriminatory discipline in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Plaintiff also alleged retaliation in violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14.

2

In the complaint, plaintiff averred she had "long been a victim of harassment, retaliation[,] and discrimination at the hands of her employer, the [GCPO]." The complaint further alleged, "Having previously sued her employer, [plaintiff] hoped the settlement of that action would bring a change in her workplace. Unfortunately, before the ink was dry on the settlement agreement, . . . [d]efendants restarted their unlawful conduct toward [p]laintiff."[1]

In the complaint, plaintiff described herself as "an openly gay female" "employed as a [d]etective with the GCPO," an "arm" of Gloucester County. Plaintiff's employment as a detective with the GCPO began in 2007. Plaintiff alleged "over the course of her career, [she] has been highly regarded as a knowledgeable and efficient officer," her "performance has met or exceeded the expectations of [d]efendants," and "she has never received a negative evaluation." Plaintiff added she "served as an expert in criminal trials," "received multiple awards based on her merit as an officer," and "is certified to teach her fellow . . . officers."

In the complaint, plaintiff asserted the "GCPO has long been a hostile work environment for [p]laintiff as a gay female" and "[t]he GCPO has long

---

[1] The previous lawsuit, filed March 9, 2020, was resolved in a confidential settlement on December 10, 2021.

A-0390-24

tolerated a work environment that is hostile to women, racial minorities, and the LGBTQ+ community." To support her claims, plaintiff delineated specific instances of alleged unlawful conduct, including disproportionate disciplinary action, discriminatory incidents related to her sexual orientation, unexplained removals from prestigious positions, placement on light duty in violation of office policy, and transfer to a unit historically staffed by non-law enforcement personnel.

1.  Plaintiff's Removal from the Chaplain Program.

Regarding the first incident, the complaint alleged that in 2020, the GCPO created a chaplain program "to establish an on-call system where chaplains could be dispatched . . . in response to traumatic events." Plaintiff volunteered for the program and was subsequently "appointed to serve as the [c]haplain [c]oordinator." Under her "direction and leadership," the program "was extremely successful" and was touted as "the flagship program in . . . New Jersey."

On March 6, 2022, a GCPO co-worker "commented that [p]laintiff being responsible for the [c]haplain [p]rogram was like, 'the pot calling the kettle black,' referring to the fact that [p]laintiff was an openly gay member of the LGBTQ+ community." Plaintiff alleged the comment "suggest[ed] it was

improper for [p]laintiff to administer a program involving religious leaders in the community." Although "[p]laintiff reported the comments to her supervisor, . . . no action was ever taken by [d]efendants." Instead, "the day after the homophobic comment" was made, the "GCPO removed [p]laintiff" as chaplain program coordinator and replaced her with "another female co-worker who [was] not a member of the LGBTQ+ community." Plaintiff "was never formally notified of her removal nor provided a reason for the removal."

## 2. Plaintiff Disciplined for Database Search.

Next, the complaint detailed a "highly[] publicized incident" that ultimately led to disciplinary proceedings against plaintiff. The incident occurred on February 5, 2022, at Ott's Bar and Grill in Washington Township, Gloucester County, and "involved an allegation that an off-duty police officer assaulted and sucker punched a male victim at the bar" (the Ott's incident). Plaintiff coached "a children's softball team" and the "victim was a family member of one of the players" on plaintiff's team.

To "verify the victim's claims" that "members of the victim's family" were "told by police on-scene" they could not file charges, "[p]laintiff requested her Sergeant, Anthony Garbarino," to "access ProPhoenix to review the public

5

information regarding the Ott's incident."[2]  According to the complaint, Garbarino "reviewed the information, confirmed that off-duty law enforcement was involved in the incident, and closed the screen before [p]laintiff was able to review any information."  Plaintiff "never attempted to access the information outside of this instance."

Subsequently, Garbarino "had second thoughts" about conducting the inquiry and "contacted GCPO Detective Brian Lloyd in the Professional Standards Unit to report the ProPhoenix look[]up."  Lloyd told Garbarino that in order to "cover his ass," he should "report the lookup and [p]laintiff's role in it to his supervisor[,] Captain Stacie Lick."  Garbarino complied.  The complaint alleged that in doing so, Garbarino "attempted to distance [himself from] his involvement in the lookup" and "blame [p]laintiff."

On March 3, 2022, plaintiff was "summoned" to the office of Thomas R. Gilbert, the GCPO Chief of Detectives and plaintiff's ultimate supervisor, where she was "informed she was involved in a major investigation" and "was being placed on light duty."  Because of plaintiff's prior lawsuit, the investigation was

---

[2] ProPhoenix was described as a database "set up to provide law enforcement with information about different calls, different reports[,] and different matters involving criminal and public safety matters."  The database "houses public information."

flagged as a conflict of interest, resulting in supersession by the Attorney General's Office and ultimate assignment to the Cumberland County Prosecutor's Office (CCPO) to conduct the investigation.  On March 25, 2022, plaintiff received official notice "she was under criminal investigation for alleged misuse of the ProPhoenix database."

According to the complaint, the "GCPO had no policy that provided for 'light duty,' other than for officers . . . returning to work following a work injury."  Plaintiff kept her weapon and badge, and had "access to the GCPO's computer systems" while on light duty.  However, plaintiff was "not allowed to take on any new cases," was "not allowed to appear on scene," was prevented "from performing her duties as a [c]rime [s]cene [i]nvestigator," and was "restricted . . . from working overtime, significantly limiting [p]laintiff's income."  Plaintiff's light duty designation relegated her to performing menial tasks and "help[ing] with GCPO events."

Thereafter, on April 1, 2022, Christine Hoffman, the Acting GCP, enacted a new policy that prohibited light duty assignments for "disciplinary purposes."  Despite the new policy, "[p]laintiff remained on 'light duty' for disciplinary purposes."

According to the complaint, the CCPO concluded its ProPhoenix

7

investigation on May 19, 2022, and "declined to pursue prosecution of any criminal charges." Plaintiff was removed from light duty assignment the following day, on May 20, 2022. Plaintiff alleged "the investigation into [her] role in the ProPhoenix lookup was pretext for the GCPO's real motive in attempting to discipline [her]," a belief plaintiff stated was shared by the CCPO detectives conducting the investigation.

According to the complaint, notwithstanding the CCPO declining to prosecute, on August 17, 2022, "[p]laintiff was served with a [p]reliminary [n]otice of [d]isciplinary [a]ction (PNDA) . . . seeking a . . . [five-day] unpaid suspension" in connection with plaintiff's role in the ProPhoenix lookup. The PNDA charged plaintiff "for a lack of candor." After plaintiff was served with the PNDA, she "demanded a disciplinary hearing." However, prior to the hearing, plaintiff received an email from Captain Lick indicating "the 'sustained' finding of lack of candor met the standard for Brady[/]Giglio[3] material" despite the fact that "no findings had been substantiated" at the time.

The complaint asserted that "[a] Brady[/]Giglio designation can be

---

[3] Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972).

A-0390-24

devastating to an officer's career."[4]  The designation resulted in plaintiff's "duty assignments" being essentially reduced to "clerical work" and her removal from the "main office to a satellite office" where she no longer had regular interaction "with her fellow detectives."  Although plaintiff was directed "to assist with a [d]iversity [r]ecruitment website and arrange a photo shoot" for officers featured on the website, she was never included on the website.  According to the complaint, other GCPO officers "outside of [p]laintiff's protected class" were not designated as Brady/Giglio officers "despite having engaged in even more egregious conduct than the allegations against [p]laintiff."

The complaint further alleged that "[o]n February 8, 2023, a departmental hearing was held," after which "the hearing officer sustained the [disciplinary] charges" against plaintiff.[5]  At the hearing, the CCPO detective who had conducted the ProPhoenix investigation reiterated "[p]laintiff was not untruthful and did not engage in a lack of candor."  The CCPO detective also confirmed that "officers from across Gloucester County had looked the Ott's [i]ncident up."

_____

[4] The complaint explained that a Brady/Giglio designation requires "prosecutors . . . to turn over evidence to defense attorneys which might be favorable to [a] defendant, including evidence that might affect a testifying officer's credibility, untruthfulness and bias."

[5] When the complaint was filed, the decision was on appeal and was later affirmed.

A-0390-24

In addition, Garbarino "testified that detectives in the GCPO routinely look things up" without adverse consequences.

The complaint recounted that plaintiff's co-worker, "a white male who [was] not a member of [p]laintiff's protected class, was also investigated for utilizing ProPhoenix to access the reports of the Ott's [i]ncident" and for being "untruthful in his reasons for doing so." However, unlike plaintiff, the coworker "was not placed on light duty during the investigation" and "his duties or responsibilities" were not "restricted in any way." The coworker was also "only given a verbal reprimand for the very same violations for which [p]laintiff was given a [five-day] unpaid suspension."[6] In the complaint, plaintiff averred the discipline imposed on her caused "harm to her reputation," "diminution of status and responsibility[,] . . . embarrassment and humiliation," and resulted in her "inability to work any overtime."

### 3. Plaintiff's Removal from Leadership Panel.

The complaint further alleged in early 2022, plaintiff "was selected to serve as a member of the mentor panel for the Gloucester County Women in

---

[6] The complaint also asserted "on information and belief that [Sergeant] Garbarino was never investigated or disciplined by [d]efendants despite using his own log[]in [credentials] to access ProPhoenix."

Law Enforcement Association." The panel presented "role models and mentors" to other female officers. "Plaintiff was the only gay female on the panel," "felt that the diversity she brought to the panel was important," and "recognized that service on the panel was important for her career moving forward." Nonetheless, without explanation, on March 18, 2022, plaintiff was removed from the panel by the GCPO and replaced by a "female officer who had been involved in the Ott's [i]ncident while off duty[,] . . . appeared inebriated during the incident[,] and hindered law enforcement efforts."

4. Gilbert's Harassment and Retaliation.

The complaint alleged that on April 4, 2022, Gilbert made comments and gestures to a coworker in plaintiff's presence "mocking" plaintiff's prior lawsuit, including "the fact that [p]laintiff and her wife were sexually harassed and humiliated" by the GCPO. After plaintiff "confirmed with her co-workers that Gilbert was talking about her previous lawsuit," on April 5, 2022, plaintiff "filed a [c]omplaint with Hoffman regarding Gilbert's behavior." The Attorney General's Office conducted an investigation into Gilbert's conduct and "recommended that 'certain members' of the GCPO receive 'retraining.'" The complaint alleged "on information and belief" that Gilbert was never disciplined nor underwent retraining for his conduct.

11

According to the complaint, on August 15, 2022, without explanation or notice, Gilbert informed plaintiff she would be "placed on 'light duty' for the second time." The complaint alleged that being placed on light duty a second time "violated the April 1, 2022 policy promulgated by the GCPO." During the light duty assignment, plaintiff was told to "work on 'reports'" but was "prohibited from working on-call or having any contact with the community" and had no "ability to earn overtime." Plaintiff "was permitted to maintain her duty weapon, her access to [the] GCPO computer systems, and her county vehicle." On September 21, 2022, "[p]laintiff was told that she was being assigned to a different supervisor . . . . to perform clerical work." Thereafter, "[p]laintiff was officially assigned to [the] Megan's Law" Unit, which "has been run exclusively by a single civilian staff member" since 1994.

5. Plaintiff's Reporting of Intern Harassment.

The complaint averred that in December 2023, "[p]laintiff was informed by two female [undergraduate] interns that an agent with [the] GCPO made them feel uncomfortable with inappropriate comments." Specifically, "the agent asked the interns if they were 'together' and made a motion with his hands like scissors, implying a lesbian sexual act." "Prior to this complaint, another female intern [had] disclosed that the agent had made comments about her appearance

12

which made her uncomfortable." The interns complained to plaintiff because they "did not feel comfortable reporting the conduct to supervisors." Plaintiff "reported the interns' complaints to her supervisor" on December 28, 2023, but was informed the complaints were "not going to be treated as an Internal Affairs investigation despite the conduct at issue." Subsequently, on January 2, 2024, plaintiff "was handed a[ Human Resources] complaint form . . . to report the complaints against the agent."

### B. Original Complaint.

In count one of the original complaint, sexual orientation-based hostile work environment, count two, gender-based hostile work environment, and count three, sexual orientation-based discrimination, all in violation of the LAD, plaintiff alleged:

> At all times[,] plaintiff was a member of a protected class under the [LAD]. . . . The conduct of . . . defendants constitutes unlawful harassment in violation of the [LAD]. . . . As a direct and proximate result of [d]efendants' unlawful conduct, [p]laintiff has suffered and will continue to suffer damages, including economic loss, opportunity loss[,] and statutory emotional distress.

In count four, retaliation in violation of the LAD, plaintiff alleged:

> At all times relevant hereto, [p]laintiff engaged in protected activity known to . . . [d]efendants. . . . Plaintiff brought her previous lawsuit to address . . .

[d]efendants' unlawful behavior. . . . Defendants[] have retaliated against [p]laintiff by utilizing the internal affairs and disciplinary process to strip her job responsibilities, subjecting [p]laintiff to a criminal investigation, restricting her ability to earn overtime, creating a hostile work environment[,] and continuing to discriminate against [p]laintiff. . . . The conduct of [d]efendants constitutes unlawful retaliation in violation of the [LAD].

In count five, retaliation in violation of CEPA, plaintiff alleged:

On March 9, 2020, [p]laintiff filed a lawsuit against [d]efendants GCPO and County of Gloucester . . . . This lawsuit settled on December 10, 2021. . . . Plaintiff also lodged a complaint regarding Gilbert's conduct. . . . Defendants violated CEPA by demoting [p]laintiff and creating a hostile work environment. . . . Defendants violated CEPA by adversely affecting [p]laintiff's work responsibilities. . . . As a direct and proximate result of [d]efendant[s'] violations of CEPA, [p]laintiff has suffered damages, including emotional distress.

In count six, discriminatory discipline in violation of the LAD, plaintiff alleged:

At all times relevant hereto, [p]laintiff was a member of a protected class. . . . As a result of the investigation into the use of ProPhoenix, [p]laintiff was disciplined in the form of a [five]-day suspension. Plaintiff was also labe[]led a [Brady/Giglio] officer. . . . Plaintiff's supervisor agreed to help [p]laintiff look up the case in ProPhoenix, even after being informed regarding the Ott's [i]ncident. . . . Detectives in the GCPO regularly use ProPhoenix to look up cases they are not professionally associated with, despite alleged policies that prohibit the same. . . . Plaintiff's co-worker, a white

14

male, was investigated and sustained for the same or similar violations. He was not suspended. . . . Plaintiff's supervisor, who engaged in the search, was not disciplined or subject to an investigation. . . . The conduct of [d]efendants constitutes unlawful discrimination in violation of the [LAD].

In addition to demanding an award of compensatory and punitive damages against defendants, as well as attorneys' fees and costs, plaintiff made a demand for injunctive relief, declaring "the practices contained [in the complaint] violate New Jersey law," and ordering defendants to "cease and desist all conduct inconsistent with the claims made [in the complaint] going forward."

## C. Dismissal Motion.

Defendants moved to dismiss plaintiff's complaint pursuant to Rule 4:6-2(e). After hearing argument, on April 12, 2024, the judge entered an order granting defendants' motion. The order specified, "Plaintiff's [c]omplaint is dismissed, which dismissal shall become with prejudice if [p]laintiff does not move to amend her [c]omplaint within [thirty] days." An accompanying memorandum of decision explained the judge's reasoning.

Regarding counts one and two, the judge agreed with defendants that dismissal was warranted because "[p]laintiff's allegations of a hostile work environment based under the []LAD [did] not meet the requisite threshold of 'severe or pervasive.'" At the outset, the judge found the conduct could not be

15

considered "pervasive" because "[b]y [p]laintiff's own assertions, the instances complained of occurred weeks and even months from one another."

Next, addressing each incident in turn, the judge explained:

> Plaintiff alleges multiple incidents in support of her []LAD claim. The first allegedly occurred on March 6, 2022, when an unnamed co-worker at GCPO commented that [p]laintiff being responsible for the [c]haplain [p]rogram was like "the pot calling the kettle black." However, this remark, while offensive, carries no nexus to sexual orientation or gender and does not support a claim under the []LAD. Indeed, it appears a comment linked to her insubordination and lack of candor arising from the ProPhoenix misuse.
>
> The second instance was when two female interns informed [p]laintiff that a GCPO agent made them feel uncomfortable by asking them if they were "together" while making gestures suggesting sexual lesbian acts. While the [c]ourt again acknowledges the offensive nature of such comments, it does not deem this incident severe enough to support an []LAD claim, particularly since it was relayed to [p]laintiff by a third party rather than directed at [p]laintiff personally. . . .
>
> Plaintiff then complains of never being featured on the GCPO's diversity website. However, the [c]ourt does not consider this conduct severe enough to support an []LAD claim. Again, given [p]laintiff's disciplinary history, the employer could legitimately select not to include her. Additionally, [p]laintiff claims a five-day suspension as proof of a hostile work environment. However, the suspension resulted from misconduct sustained upon appeal. Regarding [p]laintiff's contention of facing a hostile work environment due to being placed on light duty, the [c]ourt finds no

precedent suggesting that light duty assignments alone constitute significant damages. Lastly, [p]laintiff's complaints of being removed from mentoring programs and excluded from a diversity photoshoot may be upsetting to her, but the [c]ourt does not consider these actions severe enough to meet the standards outlined in the []LAD.

The [c]ourt will also note that it is aware of a prior lawsuit brought by [p]laintiff against [d]efendant[s]. There is undoubtedly tension between the parties. Tension alone [cannot] automatically satisfy the required "severe or pervasive" standard.

Regarding counts three and four, plaintiff's sexual orientation-based discrimination and retaliation claims, the judge again agreed with defendants that dismissal was warranted "because [plaintiff] fail[ed] to allege that she suffered an adverse employment" action. The judge rejected plaintiff's assertions that "a five-day suspension," "place[ment] on light duty in violation of policy," and "transfer[] to a unit historically . . . staffed" by non-law enforcement personnel "resulted in significant adverse changes to her employment."

The judge explained:

[T]he [five]-day suspension was found justified on appeal and cannot serve as evidence of wrongful conduct on the part of [d]efendant[s]. Additionally, a purely lateral transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. . . . Plaintiff

17

does not allege a demotion or a change in title or salary. Accordingly, [p]laintiff's [c]omplaints evaporate in the light of fair analysis of the nature of alleged facts.

Likewise, regarding count five, plaintiff's CEPA claim stemming from her initial lawsuit, the judge determined dismissal was warranted because plaintiff could not establish a prima facie case of retaliation given the "significant gaps between the alleged protected activity and adverse actions."[7] The judge reasoned:

> Plaintiff's prior lawsuit ended on December 10, 2021, and she alleges around a month later, she began experiencing mistreatment. On March 6, 2022, offensive comments were made about her role as [c]haplain [c]oordinator. Despite reporting them, no action was taken. The next day, March 7, 2022, she was removed from her position. However, . . . [p]laintiff suffered no identifiable damage. Furthermore, [p]laintiff has been found insubordinate and suffered a duly imposed [five]-day suspension which was affirmed by the [c]ourt. The tension between [p]laintiff and her employer is likely to exist for some time[,] and she is in disagreement with her recent discipline. However, based on the record before the [c]ourt there are insufficient facts to permit the present complaint to be maintained.

As to count six, plaintiff's discriminatory discipline claim stemming from the ProPhoenix investigation, the judge held plaintiff failed to "raise[] her

---

[7] The judge found the analysis applied with equal force to plaintiff's retaliation claim under the LAD alleged in count four.

retaliation claim during the disciplinary proceedings," contrary to our Supreme Court's holding in Winters v. North Hudson Regional Fire and Rescue, 212 N.J. 67 (2012). The judge interpreted Winters as obligating "employees . . . to raise a defense of retaliation during administrative disciplinary proceedings." Because plaintiff failed to raise her retaliation claim in the disciplinary proceeding, the judge determined "her failure to do so renders her retaliation claim barred from consideration" and subject to dismissal.

## D. Proposed Amended Complaint.

On May 13, 2024, plaintiff moved for leave to file an amended complaint to comply with the April 12, 2024 order. In a supporting certification, plaintiff's counsel averred:

> The [a]mended [c]omplaint alleges that the harassment and hostile work environment [p]laintiff experienced during the period of time between the date [p]laintiff filed her lawsuit, plaintiff was subjected to harassment and a hostile work environment [that] included stripping [plaintiff] of her regular duties in crime scene investigation, limiting her ability to earn overtime, denying training opportunities, ostracizing her in the work[]place, and moving her into sections where she was forced to work with people who previously harassed her. . . . Plaintiff also alleges that . . . [the] retaliatory and discriminatory transfer was not a lateral transfer, and . . . removed her from all police work and resulted in a significant reduction in her wages as a

19

result of her inability to earn overtime. . . .[8] Plaintiff also alleges that the GCPO continues to fail [to] adequately train and supervise its employees and has allowed a hostile work environment to continue.

The proposed amended complaint added another incident to bolster plaintiff's hostile work environment claims, alleging:

> Most recently, the GCPO's failure to properly train and supervise the staff, and its continued tolerance of conduct [that] violates [the] rights of women and others in protected classes came to light again when a male employee of the GCPO who was assigned an office in the new Child Advocacy Center displayed a wall clock in his office which was made out of a drawing of a vagina. . . . Plaintiff learned that the male supervisor obtained a copy of a drawing of a vagina and purposely turned it into a clock and hung it on the wall of his office in the Child Advocacy Center. . . . When . . . plaintiff became aware of the clock, fear of reprisal prevented her and others from reporting it. . . . Upon information and belief that male employee received no discipline for the offensive and hostile behavior.

The remainder of the proposed amended complaint mirrored the original complaint.

### E. Denial of Motion to File Amended Complaint.

On August 30, 2024, the judge issued an order denying plaintiff's motion

---

[8] In the proposed amended complaint, plaintiff alleged she "lost approximately $30,000 per year in earned overtime" and "[n]o male officer who has been disciplined for any similar alleged conduct has been denied overtime opportunities."

for leave to file an amended complaint. In an accompanying memorandum of decision, the judge determined the proposed amendments did not change the complaint, rendering any amendment futile. Specifically, as to plaintiff's hostile work environment claims, the judge stated plaintiff's additions did not satisfy the "severe and pervasive" prong "[e]ven when considered in conjunction with the other allegations set forth in [p]laintiff's original [c]omplaint." In support, the judge explained "a reasonable juror" would not find "a male employee allegedly displaying a wall clock in his office resembling a vagina . . . so extreme so as [to] make the working environment hostile." The judge also found the fact that plaintiff did not see the clock herself, but learned about it significant in his analysis.

As to plaintiff's discrimination and retaliation claims, the judge explained

> [W]hile [p]laintiff's complaint is essentially the loss of overtime pay, any claimed overtime loss stems from disciplinary actions related to a criminal investigation and disciplinary charges, which have been upheld on appeal.

> Accordingly, without any allegation of a demotion, change in title or salary, or a withdrawal of benefits, [p]laintiff's [a]mended [c]omplaint is futile. . . .

As to plaintiff's retaliation and discriminatory discipline claims, the judge relied on his previous analysis and "determined that any claims of retaliation

21

were barred because [p]laintiff failed to bring those claims during her disciplinary hearing." Additionally, the judge found plaintiff failed to establish an "adverse employment action" because plaintiff failed to demonstrate "any identifiable damages that [she] suffered at the hands of [d]efendant[s]." The judge reiterated "[p]laintiff was not demoted, nor was her salary changed," and her five-day suspension "was found [to be] justified on appeal." Further, according to the judge, plaintiff's loss of overtime pay "[was] not a loss of benefit sufficient to constitute an adverse employment action as it [was] the result of her discipline over the improper use of the Pro-Phoenix system."

II.

In this ensuing appeal, plaintiff raises the following points for our consideration:

> [I.] THE COURT ERRED IN DISMISSING PLAINTIFF'S ALLEGATIONS OF HOSTILE WORK ENVIRONMENT AS PLAINTIFF HAS SUFFICIENTLY ALLEGED THAT SUCH CONDUCT WAS SEVERE OR PERVASIVE.
>
> [II.] THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S ALLEGATIONS OF SEXUAL ORIENTATION[-] AND GENDER[-]BASED DISCRIMINATION AS PLAINTIFF HAS ALLEGED ADVERSE EMPLOYMENT ACTIONS.
>
> [III.] THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S CLAIMS OF RETALIATION AS

22

PLAINTIFF HAS SUFFICIENTLY PLED AN ADVERSE EMPLOYMENT ACTION.

[IV.] THE TRIAL COURT ERRED IN HOLDING THAT PLAINTIFF'S ALLEGATIONS OF RETALIATION WERE BARRED UNDER WINTERS.

a. Winters Does Not Require That a Party Raise a Retaliation or Discrimination Defense in an Underlying Disciplinary Matter.

b. Plaintiff Did Not Raise a Retaliation or Discrimination Defense in [Her] Underlying Disciplinary Matter and Cannot Be Barred from Raising Such a Claim in Superior Court.

c. Plaintiff's Discriminatory Discipline Claim Should Be Permitted to Proceed as [The] Trial Court Did Not Indicate the Reason for The Dismissal of the Claim.

III.

Our review of a dismissal for failure to state a claim pursuant to Rule 4:6-2(e) "is plenary and we owe no deference to the trial judge's conclusions." State v. Cherry Hill Mitsubishi, Inc., 439 N.J. Super. 462, 467 (App. Div. 2015). "The inquiry is limited to 'examining the legal sufficiency of the facts alleged on the face of the complaint,'" ibid. (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)), "giving the plaintiff the benefit of 'every

23

reasonable inference of fact,'" Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021) (quoting Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019)).

Such motions "require the complaint be searched in depth and with liberality to determine if there is any 'cause of action . . . suggested by the facts,'" Cherry Hill Mitsubishi, Inc., 439 N.J. Super. at 467 (quoting Printing Mart-Morristown, 116 N.J. at 746) (internal quotation marks omitted), and "to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary," Printing Mart-Morristown, 116 N.J. at 746 (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)); see Rieder v. State, 221 N.J. Super. 547, 552 (App. Div. 1987) ("A complaint should not be dismissed under this rule where a cause of action is suggested by the facts and a theory of actionability may be articulated by way of amendment.").

A motion to dismiss for failure to state a claim should be granted "only in rare instances." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 250 (App. Div. 2002). At this preliminary stage of the litigation, courts are not concerned with a plaintiff's ability to prove the allegations in the complaint. Printing Mart-Morristown, 116 N.J. at 746. Only where "a generous reading of the allegations

24

does not reveal a legal basis for recovery" should the motion be granted, <u>Kieffer v. High Point Ins. Co</u>, 422 N.J. Super. 38, 43 (App. Div. 2011) (quoting <u>Edwards v. Prudential Prop. & Cas. Co.</u>, 357 N.J. Super. 196, 202 (App. Div. 2003)), and generally "without prejudice to a plaintiff's filing of an amended complaint," <u>Printing Mart-Morristown</u>, 116 N.J. at 772.

Nonetheless, a complaint should be dismissed if it "states no claim that supports relief, and discovery will not give rise to such a claim." <u>Dimitrakopoulos</u>, 237 N.J. at 107. Indeed, "the essential facts supporting [the] plaintiff's cause of action must be presented in order for the claim to survive" and "conclusory allegations are insufficient in that regard." <u>Scheidt v. DRS Techs., Inc.</u>, 424 N.J. Super. 188, 193 (App. Div. 2012). Thus, "a dismissal is mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted." <u>Rieder</u>, 221 N.J. Super. at 552.

"<u>Rule</u> 4:9-1 requires that motions for leave to amend be granted liberally." <u>Kernan v. One Wash. Park Urb. Renewal Assocs.</u>, 154 N.J. 437, 456 (1998). "That exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile." <u>Notte v. Merchs. Mut. Ins. Co.</u>, 185 N.J. 490, 501 (2006). The question of futility is "whether the amended claim will nonetheless fail and,

A-0390-24

hence, allowing the amendment would be a useless endeavor." Ibid. Additionally, "motions for leave to amend are to be determined 'without consideration of the ultimate merits of the amendment'" and "those determinations must be made 'in light of the factual situation existing at the time each motion is made.'" Ibid. (quoting Interchange State Bank v. Rinaldi, 303 N.J. Super. 239, 256 (App. Div. 1997)).

We review the denial of a motion for leave to file an amended complaint for abuse of discretion. Franklin Med. Assocs. v. Newark Pub. Schs., 362 N.J. Super. 494, 506 (App. Div. 2003). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)).

Turning to the causes of action at issue in this appeal, the LAD was enacted "to root out the cancer of discrimination" in the workplace by prohibiting unlawful employment practices based on "race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, [or] sex." Cutler v. Dorn, 196 N.J. 419, 430 (2008) (first quoting Cicchetti v. Morris Cnty. Sheriff's Off., 194 N.J. 563, 588 (2008); then quoting N.J.S.A.

26

10:5-12(a)).  "Because of its remedial purpose, the LAD should be construed liberally to achieve its aims."  Zive v. Stanley Roberts, Inc., 182 N.J. 436, 44 (2005).  "CEPA, 'like LAD, is a civil rights statute,'" Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431-32 (1994)), that provides "protection to vulnerable employees who have the courage to speak out against or to decline to participate in an employer's actions that are contrary to public policy mandates," Yurick v. State, 184 N.J. 70, 77 (2005).

"To establish a cause of action under the LAD based on a hostile work environment," a plaintiff must allege "the complained-of conduct (1) would not have occurred but for the employee's protected status,[9] and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive."  Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 24 (2002).

In determining whether conduct is severe or pervasive, an "examination of (1) 'the frequency of all discriminatory conduct'; (2) 'its severity'; (3) 'whether it is physically threatening or humiliating, or a mere offensive utterance'; and

---

9  In her original complaint and proposed amended complaint, plaintiff asserted she "is an openly gay female."  Plaintiff's protected status is not in dispute.

A-0390-24

(4) 'whether it unreasonably interferes with an employee's work performance'" is required. Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008) (quoting Green, 177 N.J. at 447). This is "conduct that would 'make a reasonable [person] believe that the conditions of employment are altered and [that the] working environment is hostile.'" Cutler, 196 N.J. at 431 (alterations in original) (quoting Lehmann v. Toys 'R' Us, 132 N.J. 587, 603-04 (1993)).

"'Severe or pervasive' conduct . . . can be established by citing 'numerous incidents that, if considered individually, would be insufficiently severe.'" Id. at 432 (quoting Lehmann, 132 N.J. at 607). This is because "[v]iewing incidents solely in isolation fails to account for the cumulative and debilitating effect that harassing conduct can have in the workplace" and "[i]n most cases, it is the cumulative impact of separate successive incidents that cements the hostile work environment." Ibid.; see Godfrey, 196 N.J. at 196-97 ("It is insufficient to assess incidents individually as if each were hermetically sealed from the others."). Still, "in certain circumstances, even a single comment can be so severe as to pollute the work environment, rendering it irretrievably hostile." Cutler, 196 N.J. at 432 n.7.

In considering "whether conduct is sufficiently severe or pervasive to create a hostile work environment," a court should "focus on the 'harassing

28

conduct . . . , not its effect on the plaintiff or the work environment.'"  Id. at 431

(omission in original) (emphasis omitted) (quoting Lehmann, 132 N.J. at 606).

"That is because neither 'a plaintiff's subjective response' to the harassment, nor

a defendant's subjective intent when perpetrating the harassment, is controlling

of whether an actionable hostile environment exists."  Ibid. (citations omitted)

(quoting Lehmann, 132 N.J. at 613).

> Turning to the discrimination claim,
>
>> [t]he elements comprising the traditional formulation of the prima facie case for discrimination are that:  (1) plaintiff belongs to a protected class; (2) [he or] she was performing [his or] her job at a level that met [his or] her employer's legitimate expectations; (3) [he or] she suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions.
>>
>> [El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 167 (App. Div. 2005).]

To establish a prima facie claim for retaliation under the LAD, "[a]

plaintiff must demonstrate:  (1) that [he or] she engaged in protected activity;

(2) the activity was known to the employer; (3) [the] plaintiff suffered an adverse

employment decision; and (4) there existed a causal link between the protected

activity and the adverse employment action."  Young v. Hobart W. Grp., 385

N.J. Super. 448, 465 (App. Div. 2005).

A-0390-24

The LAD prohibits an employer from taking reprisals against an employee because the employee has opposed any practices or acts forbidden under the LAD or because the employee filed a complaint, testified, or assisted in any proceeding under the LAD. N.J.S.A. 10:5-12(d). However, the LAD does not define "adverse employment action" and there is no bright-line rule in determining what constitutes an adverse employment action. Mancini v. Twp. of Teaneck, 349 N.J. Super. 527, 564 (App. Div. 2002).

As such, it is permissible to "look[] for guidance to federal law dealing with Title VII and Civil Rights legislation to determine what constitute[s] an adverse employment decision in the context of a LAD retaliation claim." Ibid. Some factors used in determining whether an adverse employment action has taken place include: "[T]he employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees." Ibid. "[A]ssignment to different or less desirable tasks can be sufficient to constitute an adverse employment action . . . ." Ibid.

In Roa v. Roa, our Supreme Court considered "how harmful an act of retaliatory discrimination must be" to be actionable under the LAD. 200 N.J. 555, 575 (2010). The Court adopted the United States Supreme Court's Title

30

VII retaliation standard established in <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 68 (2006). <u>Roa</u>, 200 N.J. at 575. Our Court elucidated the test regarding the sufficiency of the employer's adverse action is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Ibid.</u> (quoting <u>Burlington</u>, 548 U.S. at 68) (internal quotation marks omitted). The <u>Roa</u> Court also acknowledged that the retaliation statutes do not protect plaintiffs from "those petty slights or minor annoyances that often take place at work and that all employees experience." <u>Ibid.</u> (quoting <u>Burlington</u>, 548 U.S. at 68).

To establish a prima facie cause of action under CEPA,

> a plaintiff must demonstrate that

>> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3[(c)] (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

A-0390-24

[Yurick, 184 N.J. at 78 (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

N.J.S.A. 34:19-3(c) describes a whistle-blowing activity as an employee's objection or refusal "to participate in any activity, policy or practice which the employee reasonably believes":

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;
>
> (2) is fraudulent or criminal . . . ; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

Our jurisprudence has accepted that retaliation claims in employment settings may be based on a pattern of retaliatory behavior, and not just on discrete actions. "Our Supreme Court has stated in dictum that retaliation . . . 'need not be a single discrete action.'" Beasley v. Passaic Cnty., 377 N.J. Super. 585, 608 (App. Div. 2005) (quoting Green, 177 N.J. at 448); see also Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 435 (App. Div. 2005) ("[W]hile [the] plaintiff was not discharged, suspended[,] or demoted, when the facts are viewed in a light most favorable to him, a jury could draw an inference that he suffered a series of adverse retaliatory actions by his employer.").

A-0390-24

According to the Court, an "'adverse employment action taken against an employee in the terms and conditions of employment' can include . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Green, 177 N.J. at 448 (internal citations omitted) (quoting N.J.S.A. 34:19-2(e)). Moreover, "employer actions that fall short of [discharge, suspension, demotion, or transfer] may nonetheless be the equivalent of an adverse action." Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 378 (Law Div. 2002), aff'd, 362 N.J. Super. 245 (App. Div. 2003).

IV.

Applying these principles, we are satisfied plaintiff sufficiently pled causes of actions under the LAD and CEPA to survive a motion to dismiss pursuant to Rule 4:6-2(e), and conclude the judge misapplied the applicable standard at the pleading stage in dismissing her complaint. Instead of evaluating plaintiff's complaint "to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim," Printing Mart-Morristown, 116 N.J. at 746 (quoting Di Cristofaro, 43 N.J. Super. at 252), the judge analyzed the merits of the dispute and addressed plaintiff's allegations as discrete acts instead of parts of a pattern of unlawful activity.

First, the judge determined plaintiff's allegations in counts one and two did not meet the requisite threshold of severe or pervasive. However, plaintiff's allegations sufficiently demonstrated defendants' conduct was severe or pervasive to establish prima facie hostile work environment claims based on sexual orientation and gender discrimination. In her complaint, plaintiff delineated several incidents establishing the severe or pervasive prong, including the chaplain program comment and her unexplained removal from the program; Gilbert openly mocking plaintiff's prior lawsuit in plaintiff's presence; plaintiff's placement on light duty and the adverse impact on her work assignments; plaintiff's Brady/Giglio designation before a dispositive finding and the associated negative career implications; and the GCPO agent's lesbian sex act gesture to the female interns.

The judge found the alleged incidents were not pervasive because they occurred "weeks and even months from one another." In so doing, the judge treated each allegation "as if each were hermetically sealed from the others." Godfrey, 196 N.J. at 196-97. However, taken together, the frequency and intensity of the incidents "would 'make a reasonable [person] believe that the conditions of employment are altered and [that the] working environment is

A-0390-24

hostile.'" Cutler, 196 N.J. at 431 (alterations in original) (quoting Lehmann, 132 N.J. at 603-04).

Critically, the judge found the incident involving the female interns was not severe enough to support an actionable claim, in part because it was relayed by a third party and not directed at plaintiff personally. However, the plaintiff's work environment in a hostile work environment case "is affected not only by conduct directed at herself but also by the treatment of others." Lehmann, 132 N.J. at 611. As such, "the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct." Ibid.[10]

Next, the judge found dismissal of counts three, four, and five was warranted because plaintiff failed to allege she suffered an adverse employment action. However, plaintiff sufficiently alleged an adverse employment action to support her LAD discrimination and retaliation claims as well as her CEPA claim. In her complaint, plaintiff alleged she was the only person suspended and labeled a Brady/Giglio officer despite other members outside her protected class engaging in the same or more egregious conduct. She asserted she was disciplined in a retaliatory and discriminatory manner when she received

---

[10] Because we first address the allegations in the original complaint, we do not include the alleged display of a vagina clock by a male GCPO employee but the same analysis would apply.

A-0390-24

disadvantageous light duty assignments that violated office policy, diminished her job responsibilities, and prevented her from earning overtime. She was also designated a Brady/Giglio officer prior to any determination on the disciplinary charges, further restricting her assignments.

Contrary to the judge's ruling, legally cognizable adverse employment actions are not limited to "a demotion or a change in title or salary." "[A]ssignment to different or less desirable tasks can be sufficient to constitute an adverse employment action and establish a prima facie case of retaliation." Mancini, 349 N.J. Super. at 564. "So too, noneconomic actions that cause a significant, non-temporary adverse change in employment status or the terms and conditions of employment would suffice." Victor v. State, 401 N.J. Super. 596, 616 (App. Div. 2008), aff'd as modified, 203 N.J. 383 (2010).

Additionally, given the temporal proximity between the adverse employment action and the protected activity, plaintiff sufficiently pled a causal link. See Young, 385 N.J. Super. at 467 ("Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997))).

Lastly, as to count six, we agree with plaintiff that collateral estoppel does not bar her discriminatory discipline claim under the LAD because she did not raise a retaliation or discrimination defense in her underlying disciplinary matter involving the ProPhoenix investigation. Contrary to the judge's determination, an employee is only estopped from pursuing discrimination claims in the Superior Court when that employee has already unsuccessfully raised discrimination as a defense during an administrative hearing. See Winters, 212 N.J. at 92.

In Winters, our Supreme Court held that a plaintiff who unsuccessfully argued retaliation as a defense in a disciplinary proceeding was collaterally estopped from thereafter bringing a retaliation claim under CEPA. 212 N.J. at 92. In reaching that conclusion, the Court explained that "[a] litigant should not be permitted to participate in the administrative system designed to promote a fair and uniform statewide system of public employee discipline, raise a retaliation defense . . . , and then hold back on the defense in an attempt to save it for later duplicative litigation." Id. at 72 (citation omitted).

In Wolff v. Salem City Correctional Facility, we applied the Winters analysis to claims of retaliation brought under the LAD. 439 N.J. Super. 282, 297 (App. Div. 2015). There, we affirmed the grant of summary judgment after

finding the plaintiff had raised retaliation as an unsuccessful defense in his prior disciplinary proceeding. Id. at 300-01. If, however, an employee does not raise discrimination as a defense in an administrative proceeding, the employee, thereafter, may be permitted to pursue a LAD claim in the Superior Court. See Ensslin v. Twp. of North Bergen, 275 N.J. Super. 352, 372-73 (App. Div. 1994). In that regard, in Ensslin, we explained that an employee has two options for pursuing a discrimination claim. The employee can either file the LAD claim in the Superior Court or elect to present the discrimination in an administrative proceeding. See ibid.

Similarly, in Long v. Lewis, we relied on the principle that "[c]ollateral estoppel only bars relitigation of issues that were actually litigated" and held that an employee who chooses not to raise discrimination as a defense in an administrative proceeding is free to later sue her employer for unlawful discrimination under the LAD. 318 N.J. Super. 449, 456-57 (App. Div. 1999); see also Wolff, 439 N.J. Super. at 301 (explaining that the plaintiff's claims were collaterally estopped because he voluntarily chose to assert retaliation in the course of the administrative disciplinary proceedings (Sabatino, P.J.A.D., concurring)).

A-0390-24

In summary, <u>Winters</u>, <u>Wolff</u>, <u>Ensslin</u>, and <u>Long</u> do not require an employee to raise a discrimination or retaliation defense in a disciplinary proceeding. If the employee does raise the defense, then a subsequent claim in the Superior Court will be collaterally estopped. If, in contrast, the discrimination claim is not raised in the administrative disciplinary proceedings, then the employee can later raise the claim under the LAD or CEPA. <u>See</u> <u>Winters</u>, 212 N.J. at 91-92; <u>Wolff</u>, 439 N.J. Super. at 298; <u>Long</u>, 318 N.J. Super. at 455-56; <u>Ensslin</u>, 275 N.J. Super. at 370-71. Here, both parties agree plaintiff did not raise a discrimination or retaliation claim during her disciplinary proceedings. Accordingly, collateral estoppel cannot bar plaintiff's discriminatory discipline claim raised for the first time in her Superior Court complaint.

It remains to be seen, after devolvement of a proper factual record, whether plaintiff can sustain her causes of actions. However, such decisions are properly dealt with in a motion for summary judgment pursuant to <u>Rule</u> 4:46, or at trial. <u>See</u> <u>City Check Cashing, Inc. v. Nat'l State Bank</u>, 244 N.J. Super. 304, 308 (App. Div. 1990) ("The court may later consider the merits before trial should there be a motion for . . . summary judgment."). At this stage, plaintiff's complaint should have survived defendants' initial motion to dismiss. Thus, we

A-0390-24

are constrained to reverse dismissal of plaintiff's original complaint because plaintiff's burden, which has been met, is only to state a suggested cause of action. Based on our decision, we also reverse the denial of plaintiff's motion for leave to file a proposed amended complaint as we do not consider plaintiff's amendments to her complaint "futile." Notte, 185 N.J. at 501.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division